UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                              :
UNITED STATES OF AMERICA                      :        MEMORANDUM OF LAW
                                              :
    -v-                                       :        06 Cr. 1173 (SHS)
                                              :
RICARDO AZAMAR-ALATORRE, et al.,              :
                                              :
            Defendant.                        :
                                              :
-----------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## RICARDO AZAMAR-ALATORRE'S MOTIONS

By: Erika McDaniel Edwards, Esq.
Law Offices of Donaldson, Chilliest & McDaniel, LLP
Attorneys for Defendant
RICARDO AZAMAR-ALATORRE
103 East 125th Street, Suite 1102
New York, New York 10035
(212) 722-4900

## PRELIMINARY STATEMENT

Defendant RICARDO AZAMAR-ALATORRE submits this memorandum of law in support of his pre-trial motion for an order granting his request for suppression of physical evidence, including, but not necessarily limited to, a) approximately $5,150.00, two cell phones, a Blackberry, documents and other property that was recovered from defendant Azamar-Alatorre's person, b) keys and remote controls recovered from the center console area of a white Mercedes and/or defendant's person, c) approximately 40 kilograms of cocaine and any other property recovered from the trunk of a 2003 Mercury Maurader, d) money, material to shrink wrap cocaine and material to wrap and count money from inside of another vehicle which was allegedly owned by defendant or defendant's company, e) a 2003 Mercury Maurader, f) a 2002 BMW X5, g) a 1998 Lexus GS400; and h) any other property recovered from defendant's person or inside of any vehicles owned by defendant or defendant's company, as well as the vehicles. Some of the items were allegedly recovered as a result of a warrantless search and seizure of Mr. Azamar-Alatorre's alleged property by law enforcement officials after they went beyond the parameters of an alleged consent to search, or they were otherwise recovered in violation of defendant's constitutional rights. Mr. Azamar-Alatorre also moves to suppress his alleged post-arrest out-of-court statements made to law enforcement officials without the benefit of Miranda Warnings in violation of his constitutional rights.

## STATEMENT OF FACTS[1]

In a one-count Indictment, defendant Ricardo Azamar-Alatorre, along with five co-defendants, Rogelio Beltran-Beltran, Moises Zaya-Rojo, Alejandro Rosiles-Perez, Ramiro Dias

---

[1] Solely for the purposes of this motion, we have assumed the truth of the averments in the Government's Indictment and Complaint.

and Nuria Flores-Quijada, are charged with a narcotics conspiracy involving five kilograms and more of cocaine, in violation of Title 21, U.S.C. §§812, 841(a)(1) and 841(b)(1)(A). More specifically, the Indictment alleged that on or about December 4, 2006, co-defendants Beltran-Beltran, Zaya-Rojo and a co-conspirator met in New York and traveled together to Philadelphia, Pennsylvania to pick up cocaine. Co-defendants Rosiles-Perez and Zaya-Rojo met in Philadelphia in preparation for the transfer of the cocaine. The next day, on December 5, 2006, co-defendants Beltran-Beltran, Flores-Quijada and Dias all met in Philadelphia in preparation for the transfer of cocaine. Subsequently, co-defendants Zaya-Rojo and Dias went to a warehouse in Philadelphia to pick up the cocaine.

The Indictment further alleged that defendant Azamar-Alatorre and co-defendants Rosiles-Perez and Dias possessed approximately 40 kilograms of cocaine, approximately $355,290 and packaging materials for narcotics and narcotics proceeds in the warehouse. Additionally, the Indictment alleged that all three transferred approximately 10 kilograms of cocaine to co-defendant Zaya-Rojo and Zaya-Rojo, Beltran-Beltran and Flores-Quijada possessed the shipment of 10 kilograms of cocaine in New York, New York. There is also a forfeiture allegation of $5,355,290.00, a 2002 BMW X5, 1998 Lexus GS 400 and 2003 Mercury Marauder.

In addition to the above-mentioned information contained in the Indictment, the Complaint indicated that the law enforcement officials conducted surveillance in New York and Pennsylvania and followed the co-defendants over the two day period leading up to their arrests. The officers who were watching the Philadelphia warehouse observed co-defendant Dias direct co-defendant Zaya-Rojo to pull a white Ford pick-up truck that he was driving into the warehouse. The warehouse gate closed and then shortly thereafter, Dias drove the truck out of

the warehouse, with Zaya-Rojo in the passenger seat, and the gate closed again. Later, co-defendants Dias, Zaya-Rojo and Beltran-Beltran met up at a different location and then co-defendants Beltran-Beltran, Flores-Quijada and Zaya-Rojo drove back to New York in the truck and another vehicle. Law enforcement officials stopped the vehicles in New York, New York and they recovered approximately ten kilograms of cocaine from underneath a panel in the bed of the white pick-up truck.

The Complaint further alleged that the officers back in Philadelphia observed co-defendant Dias return to the warehouse, knock on the door, briefly enter and exit the warehouse and drive away. The officers stopped co-defendant Dias and he agreed to go back to the warehouse and knock on the door so that the officers could enter the warehouse.

According to the Complaint, while co-defendant Dias was being questioned, officers who were outside of the warehouse observed defendant Azamar-Alatorre, co-defendant Rosiles-Perez and a second co-conspirator leave the warehouse, defendant Azamar-Alatorre locked the gate to the warehouse and they entered a white Mercedes. The officer asked defendant Azamar-Alatorre whether he could "conduct a search," and defendant Azamar-Alatorre "consented" and told him that "the cars in the warehouse belonged to him; but that the Warehouse was not leased in his name." After receiving defendant Azamar-Alatorre's oral and written consent to search, he was read his Miranda rights and, at the officer's request, defendant Azamar-Alatorre gave the officer the key to the warehouse, along with other keys from his pockets, including a remote control for one of the cars parked inside of the warehouse.

The Complaint further alleged that the officer entered the warehouse and used the remote that defendant Azamar-Alatorre had given to him to unlock a Mercury Murado. The officer

3

opened the trunk and recovered approximately 35 kilograms of cocaine wrapped in clear plastic. After the officers informed defendant Azamar-Alatorre that the cocaine was recovered, defendant Azamar-Alatorre allegedly told the officers in substance that there was approximately $500,000 hidden in another vehicle in the warehouse, co-defendants Ramiro Dias and Alejandro Rosiles-Perez were involved in cocaine distribution and he was willing to further cooperate with law enforcement, but he was concerned about the safety of his family. The officer recovered approximately $500,000, material to shrink wrap cocaine and material to wrap and count money from another vehicle, however, the Complaint did not specify which vehicle. Defendant Azamar-Alatorre was arrested and he waived his right to speedy presentment in Pennsylvania and agreed to travel back to New York.

Defendant Azamar-Alatorre set forth a summary of the facts relevant to this motion in his Declaration, dated September 13, 2007. At the time of his arrest, defendant Azamar-Alatorre was an owner of Nikkos Auto Sales, which was a car business based in California where he often purchased cars for cash at auctions and other locations, shipped them to Mexico or California and sold them to others in hopes of making a profit. See, Declaration of defendant Azamar-Alatorre at ¶7, annexed to the Declaration of Erika Edwards as Exhibit "A," hereinafter referred to as "Azamar-Alatorre's Dec." As part of this business, defendant Azamar-Alatorre rented space inside of the warehouse to store his vehicles and he had use of the office. See, Azamar-Alatorre's Dec. at ¶¶8 and 9. The warehouse was also used by numerous other individuals who also stored their vehicles inside of the warehouse and numerous individuals kept the keys to their vehicles inside of the office and had access to same. See, Azamar-Alatorre's Dec. at ¶10.

Prior to his arrest on December 5, 2006, defendant Azamar-Alatorre had been meeting

4

inside of an office attached to the warehouse with other individuals and he used a key to lock the door to the office, not the remote control to lock the warehouse door. See, Azamar-Alatorre's Dec. at ¶¶10, 12 and 14. Defendant Azamar-Alatorre had previously seen people walk into the office and warehouse areas and potential buyers had looked at the vehicles. See, Azamar-Alatorre's Dec. at ¶11. He even saw at least one individual get inside of the Mercury Maurader where the drugs were allegedly found. See, Azamar-Alatorre's Dec. at ¶26. He also observed two individuals walk into the office and one took several vehicle keys from inside of the office and then they walked into the warehouse. See, Azamar-Alatorre's Dec. at ¶12.

After defendant Azamar-Alatorre left the office, he got into the front passenger seat of a white Mercedes, which was driven by co-defendant Alejandro Rosiles-Perez, and Mr. Rosiles-Perez' uncle was riding in the back seat of the vehicle. See, Azamar-Alatorre's Dec. at ¶15. Defendant Azamar-Alatorre recalls that Mr. Rosiles-Perez had placed several keys in or near the center console of the vehicle. See, Azamar-Alatorre's Dec. at ¶16. Shortly after they left the warehouse, they were pulled over and taken out of the vehicle at gunpoint by several law enforcement officials. See, Azamar-Alatorre's Dec. at ¶17. Defendant Azamar-Alatorre was forced to put his hands against the outside of the vehicle, give his jacket and belt to the officers and they handcuffed him with his hands behind his back. Id.

The officers searched Mr. Azamar-Alatorre's pockets and they recovered approximately $5,150.00, two cell phones, a Blackberry and other property from Mr. Azamar-Alatorre and they recovered several keys and remote controls from the center console area of the white Mercedes. See, Azamar-Alatorre's Dec. at ¶18. The items recovered from Mr. Azamar-Alatorre's person was used for his used car business. See, Azamar-Alatorre's Dec. at ¶19.

5

After the officers recovered the keys, one or more of the officers told defendant Azamar-Alatorre in substance that they were going to search the warehouse and that they could either get a search warrant or obtain his consent. See, Azamar-Alatorre's Dec. at ¶21. Defendant Azamar-Alatorre told the officer in substance that the warehouse was not his, but he asked in substance whether they were going to do the search anyway and the officer replied that they would. See, Azamar-Alatorre's Dec. at ¶22. Since Mr. Azamar-Alatorre thought that the officers were going to do it anyway, he told the officers "to do what they gotta do." See, Azamar-Alatorre's Dec. at ¶23.

Mr. Azamar-Alatorre verbally agreed to permit the officers to transport him back to New York in lieu of being presented before a judge in Pennsylvania and he later signed two documents upon his arrival in New York. See, Azamar-Alatorre's Dec. at ¶24.

Prior to defendant's arrest, his company purchased the 2003 Mercury Maurader where the cocaine was allegedly found. See, Azamar-Alatorre's Dec. at ¶26. When he had last seen the vehicle, it was parked it inside of the warehouse along with numerous other vehicles, the trunk was closed, and there were no drugs, large amounts of cash wrapped in plastic, nor any illegal substances inside of said vehicle. See, Azamar-Alatorre's Dec. at ¶ ¶26 and 28.

Mr. Azamar-Alatorre recalls that the keys to the Mercury Maurader were amongst the keys recovered from inside of the center console of the Mercedes, which had been previously taken from the office by the other individual. See, Azamar-Alatorre's Dec. at ¶29. After he was arrested, one of the officers told defendant Azamar-Alatorre in substance that he would beat the crap out of defendant if he didn't tell him what was going on and the officer mentioned that they had been working very hard on the case. See, Azamar-Alatorre's Dec. at ¶31. Defendant recalls

6

being questioned by the officer without being provided his Miranda Warnings prior to such questioning, nor did he recall knowingly and voluntarily waiving such rights prior to the questioning . See, Azamar-Alatorre's Dec. at ¶¶32 and 33.

Mr. Azamar-Alatorre did not consent to permit the law enforcement officials to search his person, nor the office, nor the inside of any vehicles owned by defendant or his company. See, Azamar-Alatorre's Dec. at ¶33.

Based upon the above, the following are just some of the material factual issues in dispute. Mr. Azamar-Alatorre denies that he locked the warehouse gate, but states that he used a key to lock the office door. He denies that the officers recovered the keys and remote controls to the vehicles parked in the warehouse from his pocket, but states that they recovered them from the center console of the white Mercedes in which he was a passenger. Defendant denies ownership of all of the vehicles inside of the warehouse, but states that his company owned some of the vehicles and that other individuals also stored vehicles in the same warehouse at the time of his arrest. Defendant also denies knowingly and voluntarily consenting to the search of the vehicles inside of the warehouse, nor the office attached to the warehouse. To the contrary, he told the officers that it was not his warehouse and, after he was told in substance that the officers were going to search the warehouse regardless of whether he consented, he told the officers to do what they had to do. After he was arrested and threatened, defendant was questioned without being properly advised of his Miranda warnings. Finally, defendant denies the majority of the substance of such statements attributed to him in the Complaint.

7

# ARGUMENT

Defendant Azamar-Alatorre's motion to suppress the physical evidence allegedly recovered from his person must be suppressed as there was no probable cause to arrest defendant, nor search defendant, so any subsequent recovery was the fruit of a poisonous tree. The physical evidence allegedly recovered from inside of the vehicles owned by defendant's company which were parked in the warehouse or anything recovered from inside of the office should be suppressed as the officers did not have a warrant to search the area, the circumstances surrounding the search did not fall within a legitimate exception to the warrant requirement, including the automobile exception, and the search went well beyond the scope of any purported consent to search the warehouse provided by defendant. Additionally, defendant Azamar-Alatorre's alleged post-arrest out of court statements must be suppressed because he was threatened and improperly interrogated while he was in police custody without properly being provided his Miranda warnings and he did not knowingly and voluntarily waive such rights.

In the alternative, should the Court decline to suppress the evidence at this time, then there are several material facts in dispute which are essential to determine whether the search and seizures were proper, and whether the alleged statements should be admitted, so an evidentiary hearing is needed to determine the outcome of these matters.

## I. Defendant Azamar-Alatorre's Motion to Suppress Physical Evidence Should Be Granted

The Fourth Amendment prohibits "unreasonable searches and seizures . . . and no Warrants shall issue, but upon probable cause . . ." United States Constitution Amendment IV. When determining whether a search and seizure is reasonable, Courts must consider "the

8

intrusiveness of the search" on the person's fourth amendment interests and balance that interest against "its promotion of legitimate governmental interests." See, Security and Law Enforcement Employees v. Carey, 737 F.2d 187, 201 (2d Cir. 1984). The Fourth Amendment protects an individual's reasonable expectation of privacy and the person challenging a search and seizure must manifest a subjective expectation of privacy and that expectation must be one that is recognized by society as objectively reasonable. See, Katz v. U.S., 389 U.S. 347, 357 (1967) and Smith v. Maryland, 442 U.S. 735, 740-741 (1979). If an individual can establish a protected privacy interest, then a warrantless search is only valid if it may be justified by a recognized exception to the warrant requirement and absent such an exception, a warrantless search is per se unreasonable. Id.

One such exception to the warrant requirement is the automobile exception which permits law enforcement officials to search a vehicle without a warrant if there is probable cause to believe that a vehicle contains evidence of a crime. This exception is justified mainly because of a vehicle's mobility, which often makes obtaining a warrant impractical and the fact that there is a lower expectation of privacy in a vehicle than in a home because of the "pervasive regulation" of vehicles. See, California v. Carney, 471 U.S. 386, 391-94 (1985).

If law enforcement officers have the requisite probable cause to search a vehicle for a particular item, then they can search a passenger's property located inside of the vehicle if the property is capable of concealing the object of the search. See, Wyoming v. Houghton, 526 U.S. 295, 307 (1999). However, this rule does not permit the officers to search the passenger's person. Id. at 303.

When the probable cause relates to a particular container inside of the vehicle and not the

9

vehicle itself, then the container may be searched without a warrant. See, California v. Acevedo, 500 U.S. 565 (1991).

A police officer is permitted to stop and frisk an individual when the officer observes "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." See, Terry v. Ohio, 392 U.S. 1, 30 (1968). When there is a lawful investigatory detention in progress, police officers who reasonably suspect that an individual is armed may conduct a protective frisk of that person for weapons. Id. at 23; see also, Ybarra v. Illinois, 444 U.S. 85, 94 (1979).

However, refusal to answer an officers questions, or failure to cooperate with an officer's instructions does not necessarily justify a frisk for weapons unless the officer reasonably believes that the individual is armed and dangerous. U.S. v. Oates, 560 F.2d 45, 61 (2d Cir. 1977). Whether reasonable suspicion exists is determined by the totality of the circumstances on a case by case basis.

Regardless of a police officer's subjective intent for doing so, an officer may stop a vehicle if there is probable cause to believe that a traffic infraction occurred. See, Whren v. United States, 517 U.S. 806, 819 (1996). Since an officer's safety is a paramount concern in vehicle stop cases, once an officer lawfully stops a vehicle, the officer may order the driver out of the vehicle. See, Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977). This rule was extended to passengers to permit an officer to order a passenger out of a vehicle that was lawfully stopped for a traffic infraction pending the completion of the stop. See, Maryland v. Wilson, 519 U.S. 408 (1997).

However, an officer may not frisk a person merely because that person or the driver of a

vehicle that the individual was occupying committed a traffic infraction. Therefore, even if officers are justified in briefly detaining an individual, they may not frisk the individual unless they have "constitutionally adequate, reasonable grounds for doing so." Sibron v. New York, 392 U.S. 40, 64 (1968). Since many gestures can have innocent intentions or interpretations, the law requires more than a mere furtive gesture to constitute probable cause to search or arrest an individual. Id. at 66-67.

A warrantless search and seizure without probable cause can be proper if a person authorized to do so consents to permit the law enforcement officials to search their person or a particular area. See, United States v. Elliott, 50 F.3d 180, 185 (2d Cir. 1995). The Government has the burden of demonstrating that the consent was voluntary, or without coercion, by a preponderance of the evidence. See, United States v. Isiofia, 370 F.3d 226, 230 (2d Cir. 2004). Whether such consent to search is voluntarily provided should be determined by the totality of the circumstances, based upon whether it was a product of free choice, instead of a "mere acquiescence in a show of authority." United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993).

Courts should consider several factors to determine whether a consent to search is voluntary, including the person's age, education, background, physical and mental condition, and the setting in which the consent was obtained. See, Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). Courts have found consents to search involuntary in cases where the officers were going to search the premises regardless of the consent. See, United States v. Sanchez, 635 F.2d 47, 61 (2d Cir. 1980; Bumper v. North Carolina, 391 U.S. 543, 550 (1968) (where officers said they had a warrant to search, but said warrant was not relied upon for the search); and United States v. Isiofia, 370 F. 3d 231 (where an individual had been handcuffed to a table for a half

11

hour, English was not the suspect's first language and several agents converged on the location).

Even if the consent to search is deemed to have been voluntarily provided, it is still possible that such consent may be invalid if it is tainted by a prior illegal search. See, United States v. Tortorello, 533 F.2d 809, 815 (2d Cir. 1976).

The scope of the consent to search is determined by what a reasonable person would have understood based upon the conversation with the officer regarding the search. See, Florida v. Jimeno, 500 U.S. 248, 250-51 (1991) (when there is a consent to search a car, such consent extends to the search of a bag on the floor inside of the car).

In applying these principles to the facts in our case, the evidence recovered must be suppressed. Here, defendant Azamar-Alatorre was stopped, searched and arrested without probable cause because there was insufficient evidence that he was involved in any criminal activity, nor that the officers reasonably believed that defendant possessed a weapon, or that he posed a danger to themselves or others.

In fact, the officers merely observed defendant present inside of the office attached to the warehouse, he was seen locking the office and he was a passenger of a vehicle in which the driver was seen meeting with another individual suspected of being involved in the drug conspiracy the day before their arrest. Since defendant was a passenger in a car stop and the driver was the individual suspected of criminal activity the day before, the officers should not have been permitted to search defendant at all, or at the very least, they could have only conducted a brief pat down for weapons. The removal of defendant from the car at gunpoint, removal of his belt and jacket and subsequent search of his pockets was unlawful and the officers had no probable cause to arrest defendant. As such, the recovery of any property obtained from

defendant's person must be suppressed.

Additionally, although defendant denies owning the white Mercedes that was stopped by the police, defendant still has standing to contest the recovery of the vehicle keys and remote access devices for several of the vehicles parked inside of the warehouse which were unconstitutionally recovered from inside of the center console of the vehicle next to defendant. Also, although defendant denies ownership of the cocaine, money and material recovered from inside of certain vehicles or in the office, he has standing to contest the recoveries from all vehicles in which he has an ownership interest.

Here, defendant did not have the authority to consent to search the entire warehouse, since he was merely a tenant who was permitted to park his vehicles inside of said warehouse. In fact, defendant made it clear to the officers that it was not his warehouse.

Additionally, defendant's purported consent to search the warehouse was not voluntarily given to the law enforcement officials. Such alleged consent was only provided after defendant was removed from the vehicle at gun point, there were several officers around defendant in an impressive show of force, he was detained and handcuffed for an extensive period of time and the officers made it clear to defendant that they were going to search the warehouse regardless of whether he consented to such search or not.

Based upon defendant's background and characteristics, it is evident that his consent was not voluntary. Although defendant has lived in the United States for several years and he speaks conversational English very well, he was born in Mexico, Spanish is his first language and he is not a United States citizen. Therefore, based upon the totality of the circumstances, including the nature of the conversation with the officers, defendant did not voluntarily consent to search the

13

warehouse.

Even if this Court determines defendant's consent was voluntarily provided, then such search is still invalid because it is tainted by the prior unconstitutional search of defendant's person.

It is also clear that the officers' search of the office attached to the warehouse and the search inside of the trunk and other areas of the vehicles were improper because such searches went well beyond defendant's alleged consent to search the warehouse. Defendant did not own all of the vehicles parked inside the warehouse and, upon information and belief, the officers searched inside all of the vehicles.

Additionally, a reasonable person in defendant's position would not have understood that by permitting the officers to search the warehouse, such search included the office adjacent to the warehouse and the trunk and closed compartments of any vehicles parked inside of said warehouse. This is particularly true based upon the Government's interpretation of the conversation between the officer and the defendant as set forth in the Complaint where the officer allegedly merely asked defendant for consent to search. As such, the search of the office and inside of the vehicles went well beyond the scope of defendant's consent.

For the above-mentioned reasons, the physical evidence must be suppressed.

II.     Defendant Azamar-Alatorre's Motion to Suppress his Post-Arrest
        Statement Should Be Granted

Defendant Azamar-Alatorre's alleged statements to the officers on December 5, 2006, should be suppressed as the officers threatened defendant with bodily harm and improperly interrogated defendant while he was clearly in custody without reading him his Miranda

14

warnings in violation of his rights pursuant to the Fifth and Sixth Amendments to the United States Constitution. Additionally, defendant did not voluntarily waive his privilege against self-incrimination, pursuant to the Fifth Amendment of the Constitution of the United States.

In Miranda v. Arizona, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). The Miranda Court warned that custodial interrogation generates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he does not otherwise do so freely." Miranda, 384 U.S. at 467. Therefore, if law enforcement officials elicit statements from a defendant as a result of custodial interrogation, then such statements must be suppressed if proper Miranda warnings were not given prior to such statements being made. Id. at 444-45.

Therefore, Mr. Azamar-Alatorre respectfully requests a hearing to determine the voluntariness of his out-of-court statements made on December 5, 2006, and whether such statements were made in violation of his constitutional rights. See, Jackson v. Denno, 378 U.S. 368, 377 (1964) and 18 U.S.C. § 3501(a).

An accused is entitled to receive Miranda warnings after he has been taken into custody or otherwise deprived of his freedom of action in a significant way. Id. at 444. Miranda warnings are required only where there has been "such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977).

When a suspect has not been formally arrested, then the test used to determine whether he is in custody for Miranda purposes is an objective one based upon whether a reasonable person in

the defendant's position would have understood himself to be subjected to a restraint on freedom of movement of the degree associated with a formal arrest. See, Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

This determination "focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." United States v. Mitchell, 966 F.2d 92, 100 (2d Cir. 1992). Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the law enforcement officer's will and to confess. Id. Consequently, many courts decline to find that a suspect is in custody without a formal arrest, unless law enforcement officials affirmatively convey the message that the defendant is not free to leave. See, Companiera v. Reid, 891 F.2d 1014, 1020 (2d Cir. 1989).

The determination of whether law enforcement officials coerced an accused into making a statement against his free will is whether the conduct of the law enforcement officials "was such as to overbear [an accused's] will to resist and bring about confessions not freely self-determined." Rogers v. Richmond, 365 U.S. 534, 544 (1961). This determination should be based upon a totality of the circumstances analysis. See, Green v. Sculley, 850 F.2d 894 (2d Cir. 1988).

In Green, the court held that there is no single factor that determines whether an accused's confession is voluntary, but it must be determined "only after careful evaluation of the totality of the surrounding circumstances." Id. at 901. In applying the totality of the circumstances test, courts should consider three circumstances: 1) the characteristics of the accused, including the accused's experience, background, youth, education and intelligence, 2) the conditions of interrogation, including the place where an interrogation is held, the length of detention and

16

whether counsel was present, and 3) the conduct of law enforcement officials, including the repeated and prolonged nature of the questioning, the failure to inform the accused of his constitution rights, physical mistreatment or deprivation, and psychologically coercive techniques, such as brainwashing, promises of leniency or help, or other benefits. Id. at 901-902; see also, Schneckloth v. Bustamonte, 412 U.S. 218, 225-226 (1973), and U.S. v. Guarno, 819 F.2d 28, 30 (2d Cir. 1987). This analysis should be determined on a case by case basis. Green, at 902.

Although the Green court found the police officers' conduct to be "troubling," it declined to suppress the defendant's confession and found that it was not induced by the police officers' scare tactics involving the electric chair, false misrepresentations about evidence found against the defendant, good cop/bad cop routine, or their repeated promises to help. Id. at 903-904. The court determined that the defendant was motivated by his own concerns that without his confession, the police would not have enough evidence to convict him and he feared that he would black out again and possibly kill his own family. Id. at 904.

Courts have held that the use of trickery or deception by law enforcement officials alone does not make it impossible per se to find that a defendant voluntarily waived his rights. See, U.S. v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991). A confession is not involuntary merely because an accused did not understand that the law enforcement officials who interrogated him were not engaged in a criminal investigation, as long as the agents did not affirmatively attempt to mislead a suspect about their true purpose. See, U.S. v. Mitchell, 966 F.2d 92, 100 (2d Cir. 1992).

However, law enforcement agents cannot threaten a suspect with exorbitant and

17

unrealistic jail time to elicit a statement. See, U.S. v. Duvall, 537 F.2d 15, 25 (2d. Cir. 1976)

(law enforcement officials told a suspect that he faced a possible sentence of 100 years).

Additionally, a law enforcement agent's statement about the benefits of cooperation constitute .

interrogation if the statement was not solicited by the suspect. See, U.S. v. Montana, 958 F.2d

516, 518 (2d Cir. 1992).

Even if this Court finds that the agents were not required to give defendant his Miranda

warnings or that such warnings were properly given, then the statements must still be suppressed

because they were not voluntarily made. In challenging the voluntariness of an accused's

statement, a defendant must allege misconduct by a state actor. See, Colorado v. Connelly, 479

U.S. 157, 163 (1986) (the statements in this case were not suppressed because the court held that

the coercion involved a defendant's mental disorder where he heard voices and was not a result

of police conduct).

The determination of whether law enforcement officials coerced an accused into making a

statement against his free will is whether the conduct of the law enforcement officials "was such

as to overbear [an accused's] will to resist and bring about confessions not freely self-

determined." Rogers v. Richmond, 365 U.S. 534, 544 (1961). This determination should be

based upon a totality of the circumstances analysis. See, Green v. Sculley, 850 F.2d 894 (2d Cir.

1988).

In Green, the court held that there is no single factor that determines whether an accused's

confession is voluntary, but it must be determined "only after careful evaluation of the totality of

the surrounding circumstances." Id. at 901. In applying the totality of the circumstances test,

courts should consider three circumstances: 1) the characteristics of the accused, including the

18

accused's experience, background, youth, education and intelligence, 2) the conditions of interrogation, including the place where an interrogation is held, the length of detention and whether counsel was present, and 3) the conduct of law enforcement officials, including the repeated and prolonged nature of the questioning, the failure to inform the accused of his constitution rights, physical mistreatment or deprivation, and psychologically coercive techniques, such as brainwashing, promises of leniency or help, or other benefits. Id. at 901-902; see also, Schneckloth v. Bustamonte, 412 U.S. 218, 225-226 (1973), and U.S. v. Guarno, 819 F.2d 28, 30 (2d Cir. 1987). This analysis should be determined on a case by case basis. Green, at 902.

In applying these principles to the facts in our case, it is clear that defendant Azamar-Alatorre's alleged post-arrest out of court statements must be suppressed as he was questioned while he was in custody, he was threatened and he was not read his Miranda warnings prior to such questioning and such statements being made.

Defendant Azamar-Alatorre was in custody at that time when the statements were made as he was stopped by numerous police officers, forcefully removed from the vehicle at gun point and placed in handcuffs, which obviously was a significant deprivation of his freedom of movement and he was definitely not free to leave.

Additionally, based upon a totality of the circumstances analysis, defendant Azamar-Alatorre did not voluntarily waive his rights and one of the officers engaged in severe misconduct by threatening to beat the crap out of defendant if he didn't tell him what was going on. Defendant is not a U.S. citizen, but his wife and children are citizens. The threats, as well as defendant's immigration status, both determined whether his alleged statements were voluntarily

19

given and coerced defendant into answering the officers' questions against his own free will.

For the above-mentioned reasons, defendant's alleged post-arrest statements must be suppressed.

III.     Defendant Azamar-Alatorre's Motion for a Bill of Particulars Should be Granted

As set forth in the undersigned's Declaration, the undersigned outlined a brief request for a bill of particulars which was not provided to the undersigned by the Government, nor defendant's previous attorney.

Such information is needed to allow defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d. Cir. 1987).

Each of the requests is necessitated by the lack of particularity in the indictment and the paucity of discovery provided thus far by the government. For example, the discovery indicates that there are several individuals with cases which may be pending in other jurisdictions, but there are no court papers besides documents pertaining to wiretap authorizations.

IV.     Defendant Azamar-Alatorre's Motion for Additional Discovery
        Should be Granted

As stated in the undersigned's Declaration, the undersigned is requesting additional limited discovery which was not provided by the Government. Most notably, the undersigned does not see copies of any Advise of Rights/Miranda Warnings forms, consent to search forms, nor Waiver of Speedy Presentment forms which should have been signed by defendant on December 5, 2006. Additionally, the documents related to the recorded conversations are so

20

heavily redacted that it is impossible for defendant to adequately prepare a defense and avoid the danger of unfair surprise at trial. Therefore, defendant requests unredacted copies of the documents pertaining to the wire tap evidence. Pursuant to Fed. R. Crim. Pro. 16, defendant requests that this Court compel the government to comply with his demand, or advise the undersigned that such documents do not exist. Such disclosure is needed to assure a fair trial.

## CONCLUSION

For the reasons set forth above, defendant respectfully requests an order (i) granting his motion to suppress the physical evidence that was allegedly recovered as a result of a warrantless search and seizure in violation of defendant's constitutional rights, (ii) granting defendant's motion to suppress his alleged post-arrest statements to law enforcement officers, (iii) granting defendant's request for a bill of particulars, (iv) granting defendant's request for additional discovery, (v) granting defendant such other and further relief as to this Court deems just and proper.

Dated: New York, New York
      September 14, 2007

                    Respectfully submitted,

                    Donaldson, Chilliest & McDaniel, LLP

                    By: Erika McDaniel Edwards
                    Attorneys for Defendant
                    RICARDO AZAMAR-ALATORRE
                    103 East 125th Street, Suite 1102
                    New York, New York 10035
                    (212) 722-4900

DECLARATION OF SERVICE

STATE OF NEW YORK          )

COUNTY OF NEW YORK       ) ss:

SOUTHERN DISTRICT OF NEW YORK   )

      I, ERIKA MCDANIEL EDWARDS, an attorney duly admitted to practice law before the

Courts of the State of New York; affirms the following to be true under penalty of perjury:

      That on the 14th day of September, 2007, I served the within Memorandum of Law upon

the attorney(s) listed below, at his/her/its listed address(es) which were so designated by said

attorney(s) for said purpose, by hand delivery.

Dated: New York, New York
       September 14, 2007

                        By: Erika McDaniel Edwards, Esq.
                        Donaldson, Chilliest & McDaniel, LLP
                        103 East 125th Street, Suite 1102
                        New York, New York 10035
                        (212) 722-4900

To:     Michael J. Garcia
        United States Attorney
        Southern District of New York
        One St. Andrews Plaza
        New York, New York 10007
        Attn.: A.U.S.A. Glen McGorty/A.U.S.A. Amy Finzi